## IN THE DISTRICT COURT OF THE UNITED STATES
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## ASHEVILLE DIVISION
## CIVIL CASE NO. 1:09cv463

| | | |
|---|---|---|
| LORRAINE E. FINNEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **MEMORANDUM OF** |
| vs. | ) | **DECISION AND ORDER** |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| _____ | ) | |

**THIS MATTER** is before the Court on the Plaintiff's Motion for

Summary Judgment [Doc. 10] and the Defendant's Motion for Summary

Judgment [Doc. 14].

## I.    PROCEDURAL HISTORY

The Plaintiff Lorraine Finney protectively filed an application for

Supplemental Security Income benefits on July 26, 2003 alleging that she

had become disabled as of May 2, 2002.  [Transcript ("T.") 121-3].  The

Plaintiff's application was denied initially and on reconsideration.  [T.  91-4,

86-9].  A hearing was held before Administrative Law Judge ("ALJ")

Gregory Wilson on December 17, 2008.  [T. 35-71].  On April 21, 2009, the

ALJ issued a decision denying the Plaintiff benefits.  [T. 16-32].   The

Appeals Council first denied the Plaintiff's request for review.  [T. 9-11].

Plaintiff requested that the Appeals Council vacate that action.  It did so

and accepted Plaintiff's contentions as additional evidence, but again

denied Plaintiff's request for review [T. 4-8], thereby making the ALJ's

decision the final decision of the Commissioner.  [T. 5-9].  The Plaintiff has

exhausted her available administrative remedies, and this case is now ripe

for review pursuant to 42 U.S.C. § 405(g).

## II.    STANDARD OF REVIEW

The Court's review of a final decision of the Commissioner is limited

to (1) whether substantial evidence supports the Commissioner's decision,

see Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28

L.Ed.2d 842 (1971), and (2) whether the Commissioner applied the correct

legal standards, Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

The Court does not review a final decision of the Commissioner de novo.

Smith v. Schweiker, 795 F.2d 343, 345 (4th Cir. 1986).

The Social Security Act provides that "[t]he findings of the

[Commissioner] as to any fact, if supported by substantial evidence, shall

be conclusive. . . ."  42 U.S.C. § 405(g).  The Fourth Circuit has defined

"substantial evidence" as "more than a scintilla and [doing] more than creat[ing] a suspicion of the existence of a fact to be established. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Smith v. Heckler, 782 F.2d 1176, 1179 (4th Cir. 1986) (quoting Perales, 402 U.S. at 401, 91 S.Ct. at 1427).

The Court may not re-weigh the evidence or substitute its own judgment for that of the Commissioner, even if it disagrees with the Commissioner's decision, so long as there is substantial evidence in the record to support the final decision below. Hays, 907 F.2d at 1456; Lester v. Schweiker, 683 F.2d 838, 841 (4th Cir. 1982).

## III.    THE SEQUENTIAL EVALUATION PROCESS

In determining whether or not a claimant is disabled, the ALJ follows a five-step sequential process. 20 C.F.R. §§ 404.1520, 416.920. If the claimant's case fails at any step, the ALJ does not go any further and benefits are denied. Pass v. Chater, 65 F.3d 1200, 1203 (4th Cir. 1995).

First, if the claimant is engaged in substantial gainful activity, the application is denied regardless of the medical condition, age, education, or work experience of the applicant. 20 C.F.R. §§ 404.1520, 416.920. Second, the claimant must show a severe impairment. If the claimant does

not show any impairment or combination thereof which significantly limits the claimant's physical or mental ability to perform work activities, then no severe impairment is shown and the claimant is not disabled. Id. Third, if the impairment meets or equals one of the listed impairments of Appendix 1, Subpart P, Regulation 4, the claimant is disabled regardless of age, education or work experience. Id. Fourth, if the impairment does not meet the criteria above but is still a severe impairment, then the ALJ reviews the claimant's residual functional capacity (RFC) and the physical and mental demands of work done in the past. If the claimant can still perform that work, then a finding of not disabled is mandated. Id. Fifth, if the claimant has a severe impairment but cannot perform past relevant work, then the ALJ will consider whether the applicant's residual functional capacity, age, education, and past work experience enable the performance of other work. If so, then the claimant is not disabled. Id.

## IV.    FACTS AS STATED IN THE RECORD

Plaintiff was 60 years old at the time of the ALJ's hearing. [T. 40]. She completed the ninth grade and obtained a GED. [Id.].

Plaintiff was seen by Dr. Teresa Bradley, a family physician with Midway Medical Center in Canton, from December 2002 to November 2003. On her initial visit, Plaintiff reported a history of migraines dating

back to when she was 17. [T. 197]. She further reported four to six migraines per month, denied daily headaches, and indicated that Imitrex shots helped some. [T. 197]. During her treatment with Dr. Bradley, Plaintiff was given a bone density test which revealed osteopenia. [T. 190]. Plaintiff was encouraged to stop smoking and engage in exercise. [Id.]. Plaintiff also complained of back pain, and an MRI revealed compression fractures of the 10th and 11th thoracic vertebral bodies. [Tr. 199]. The bone marrow within the fractures was normal, indicating that the fractures had completely healed and there was no central spinal stenosis. [Id.].

Plaintiff underwent an esophagogastroduodenoscopy with biopsy in July 2005. At that time, she was diagnosed with duodenal polyp, hiatal hernia, and Barrett's mucosa. [T. 215].

Plaintiff underwent an evaluation with Dr. Dubiel on January 31, 2006. [T. 219-25]. Plaintiff reported a history of back pain and migraine headaches. With respect to her back pain, Plaintiff reported that she had been followed by Dr. Bradley until 2003. [T. 219]. After that, she reported that she was occasionally seen in the Haywood Regional Medical Center Emergency Department, but there are no notes from that facility during that period in the record. Dr. Dubiel noted that Plaintiff never had epidural injections, chiropractic adjustments, or surgery. [Id.].

Plaintiff reported a constant aching back and burning discomfort in the right middle back radiating down to the lower back. She also reported burning and numbness on the lateral upper right leg. Plaintiff reported that the application of heat sometimes eased her discomfort, but she had not found any medication that helped. She denied taking any medication for her back pain, including over-the-counter medication [T. 219-20].

Dr. Dubiel's examination revealed intact neurologic findings. While Plaintiff had marked dorsal kyphosis of the lower thoracic spine and mild tenderness to palpation over the L4 vertebral body, there was no other tenderness noted. Straight leg raising was negative and there was full range of motion of the thoracolumbar spine with the exception of rotation, which was 0-15 degrees bilaterally. There was no apparent discomfort on range of motion testing, Plaintiff could walk on heels and toes without difficulty, and she could do a full squat and rise with one hand on the examination table. Plaintiff's joints were normal except for decreased range of motion on hip abduction and very mild arthritic changes of the distal interphalangeal joints in the fingers. [T. 222-23]. A scan of Plaintiff's lumbar spine revealed only minimal degenerative changes. [T. 225].

With respect to her migraine headaches, Plaintiff stated that she used Imitrex tablets and usually had relief after 45-60 minutes for headaches

occurring during the day.  She stated that she had received Imitrex injections in the past and that these had provided faster relief.  She reported that if she awoke with a headache, it would not respond to Imitrex and she had to go to the emergency room.  Plaintiff also stated that the headaches would sometime occur two to three times per week, and sometimes she would not have one for two weeks or so.  She reported she had quite a few visits to the emergency room due to headaches in the year prior to the examination, but there are no records of these visits.  Dr. Dubiel recommended prophylactic medication for Plaintiff's headaches.  [T. 220, 223].

In April 2006, Plaintiff presented to the emergency department with complaints of chest wall pain.  A chest x-ray showed no evidence of effusion or pneumothorax.  Plaintiff was prescribed Percocet for pain.  [T. 231-42].  In May 2006, Plaintiff presented to the emergency department with a complaint of a headache.  She was given Nubain and Phenergan, and on recheck she reported feeling much better.  She was discharged with a prescription for Imitrex and Vicodin as needed.  [T. 227-28].

Plaintiff was seen by Dr. Donald Teater, a primary care physician, from February 2007 through November 2007.  [T. 307-15, 319-35].  At an

initial visit, Plaintiff reported migraines which were helped by Imitrex, pain in her joints and muscles which was helped with Tylenol, and anxiety and depression. [T. 331]. Dr. Teater assessed the following: chronic obstructive pulmonary disorder, which was not symptomatic; a history of possible gastritis and dysplasia of the stomach or esophagus, for which he prescribed Prilosec; hypertension, for which he prescribed Prinzide; migraine headaches; diffuse pain all over, for which he recommended continuing to treat with Tylenol; and anxiety and depression, for which he recommended continuing her current medications. [T. 331].

On March 15, 2007, Dr. Teater noted that a prior tests had been positive for Barrett's esophagus. [T. 329]. On March 19, 2007, Plaintiff reported vomiting without abdominal pain. Dr. Teater ordered a GI series. [T. 328]. On March 26, 2007, Dr. Teater noted that Plaintiff's esophagus looked the same and that her stomach looked fine. Plaintiff reported that she was still vomiting, so she was placed on Reglan. [T. 327]. On April 3, 2007, Plaintiff reported doing much better since starting on Reglan and continuing on Prilosec. [T. 326].

On April 19, 2007, Plaintiff reported to Dr. Teater that she was vomiting every time she ate, but she later stated that she did not vomit

every time. Plaintiff denied having any diarrhea or constipation. Dr. Teater recommended that Plaintiff continue with Reglan. He noted that since Plaintiff's weight was stable, he did not think her vomiting was that bad. Plaintiff also reported migraine headaches and it was recommended that she continue Imitrex. [T. 323].

On May 21, 2007, Plaintiff again complained to Dr. Teater of vomiting. Plaintiff had stopped taking Reglan, which had been helping, so Dr. Teater started her on that medication again. Dr. Teater also strongly advised Plaintiff to stop smoking. [T. 321]. On June 25, 2007, Plaintiff presented to Dr. Teater with complaints of back pain that would come and go. She stated that she did not take any medication for the pain. [T. 319]. On July 31, 2007, Dr. Teater assessed Plaintiff with hypertension, bilateral lower back pain with radiation into the right leg, chronic abdominal pain and vomiting, and anxiety. He noted that Plaintiff had a UGI which did not show any delay in gastric emptying. [T. 315]. In August 2007, Plaintiff was referred to physical therapy for her back pain, but she was discharged when she failed to keep her appointments. [T. 310, 312, 314].

On September 10, 2007, Dr. Teater noted that Plaintiff had complained of persistent vomiting since he first saw her. He noted that she

had started losing weight only in the last three months, and that part of that weight loss could have been from a recent surgery. He further noted that he was not sure of the significance of her vomiting and that the UGI series was unremarkable. [T. 310].

On October 18, 2007, Plaintiff was assessed with recent chest pain, probably noncardiac, for which she had been recently hospitalized overnight; hypertension, which was well controlled; hypercholesterolemia; slightly elevated TSH; anxiety disorder, for which she was started on BuSpar; and a cough, for which she was given Tessalon Perls. [T. 309].

At her last visit on November 8, 2007, Dr. Teater noted that Plaintiff had nausea that was partially psychogenic and he recommended that she start back on Cymbalta. He also noted that her migraine headaches were doing better and that her hypertension appeared to be doing well. There was no mention of any back pain. [T. 307].

During the time she was seeing Dr. Teater, Plaintiff underwent several procedures, including a stapled internal hemorrhoidectomy and excision of low rectal polyp at the time of a rectal examination [T. 373]; a laparoscopic cholecystectomy [T. 371]; an esophagogastroduodenoscopy with biopsy [T. 367-69]; and a colonoscopy with polypectomy [T. 366]. On

August 15, 2007, Dr. Benjamin Phillips reported that after the laparoscopic cholecystectomy, Plaintiff was feeling well and her nausea and vomiting decreased significantly. Plaintiff reported that she was pleased with her surgeries and had no complaints. Dr. Phillips noted excellent progress following the laparoscopic cholecystectomy and procedure for prolapsing internal hemorrhoids. [T. 343].

Plaintiff was seen by Dr. Ofelia Balta, a primary care physician with WNC Internal Medicine, from April 28, 2008 through August 6, 2008. [T. 284-300]. During this time, she complained primarily of abdominal pain. At her initial visit, upon a review of systems, Dr. Balta noted abdominal pain, which improved with use of a proton-pump inhibitor, acid reflux symptoms, dysphagia, constipation, diarrhea, arthralgias, back pain, and anxiety, which was well-controlled. [T. 297]. Upon examination, Dr. Balta indicated moderate diffuse pain with respect to her gastrointestinal area, but otherwise noted no other abnormalities. [T. 298-99]. Neurologic and musculoskeletal examinations were normal. [T. 299]. Plaintiff was diagnosed with acute peptic ulcer disease, hypertension, anxiety, and vomiting. [Id.].

On May 5, 2008, Dr. Balta assessed Plaintiff with celiac sprue, chronic obstructive pulmonary disease, dyspnea, hypertension, vomiting, cough, and fatigue. Upon examination, she reported moderate diffuse pain in the gastrointestinal area, and she had expiratory wheezes. [T. 295]. Spirometry testing confirmed chronic obstructive pulmonary disease, and Dr. Balta advised Plaintiff to stop smoking and prescribed Symbicort. [T. 296]. Plaintiff was also advised to undergo a GI consult, [Id.], but there is no evidence she did this.

On June 6, 2008, Plaintiff returned to see Dr. Balta. Her examination findings were within normal limits except for expiratory wheezes and moderate diffuse pain in the gastrointestinal area. [T. 292]. Plaintiff reported that her vomiting had improved. [T. 290, 292]. Plaintiff also noted that she recently had started a celiac diet. [T. 290].

In a visit to Dr. Balta on August 6, 2008, Plaintiff stated that her abdominal pain was improved, although she was still nauseated and experiencing constipation. [T. 286]. An examination revealed no abnormalities except for reports of moderate diffuse pain in the gastrointestinal area. [T. 288]. Dr. Balta advised Plaintiff to treat her constipation with Miralax, Sennakot, and Fibercon. [Id.].

With regard to mental impairments, the record reflects that in February 2007, Dr. Teater noted that Plaintiff had anxiety and depression. [T. 332]. By March 2007, Dr. Teater noted that these conditions were responding well to Zoloft, Wellbutrin, and Klonopin. [T. 328]. In April 2007, Dr. Teater noted that Plaintiff's depression and anxiety remained stable. [T. 326]. In July 2007, Dr. Teater noted that while Plaintiff reported some problems with anxiety and depression, she was not in treatment or taking medication. [T. 315]. In October 2007, Plaintiff reported worsening anxiety, but it was noted that she was not taking any medication at the time. [T. 309]. Plaintiff was started on BuSpar with a note to recheck in three to four weeks. [Id.]. There are no further notations in Dr. Teater's about Plaintiff's anxiety.

During her treatment of Plaintiff, Dr. Balta noted that Plaintiff was alert and oriented with appropriate affect and demeanor. [T. 288, 292, 295, 299]. At the time, Plaintiff was taking Cymbalta. [T. 287, 291,294, 298]. Dr. Balta noted that Plaintiff's anxiety was well-controlled. [T. 286, 290, 293, 297].

Shellie E. Higgins, M.S., completed an intake of Plaintiff on May 31, 2006. [T. 251-259]. At that time, Plaintiff reported feeling anxious and depressed, and that her family had her in a constant state of worry. [T.

254]. Ms. Higgins reported that Plaintiff's mood was depressed, but that she was not a danger to herself or others. [Id.]. A symptom checklist indicated that Plaintiff had been depressed most of the day and irritable; had experienced significant weight loss; had diminished ability to think or concentrate; and had experienced muscle tension and worrying. [T. 255]. Upon a mental status evaluation, Ms. Higgins found Plaintiff to have a flattened affect and depressed mood; however, she noted no deficits in Plaintiff's speech, thought content, attention, concentration, intellectual functioning, or judgment. [T. 257-58]. Ms. Higgins gave a provisional diagnosis of major depression, recurrent, and recommended individual and group therapy. [T. 252-53].

During two subsequent sessions with Ms. Higgins, Plaintiff reported having problems with her family relationships and feeling depressed. [T. 249, 251]. After July 25, 2006, there are no further treatment notes in the record from Ms. Higgins.

Two nonexamining state agency physicians, who reviewed the evidence of record, concluded that Plaintiff could perform medium work with only occasional climbing of ladder, rope, and scaffolds, and avoidance of concentrated exposure to fumes, odors, dusts, gases, poor ventilation, and hazards. [T. 274-81, 283].

At the ALJ hearing, Plaintiff testified that her worst problem is a two-year history of vomiting every time she eats, and associated pain in her right abdomen, chest and back.  Plaintiff reported that the vomiting was not controlled with medication.  [T. 42-44.  Plaintiff further reported having back pain as a result of spinal fractures that she experienced when she was 16 years old.  She testified that this back pain had worsened recently.  [T. 44].  Plaintiff testified that she variously used Percocet, Tylenol II, a muscle relaxer, Lidoderm patches, and a heating pad to address her back pain.  [T. 47].  Plaintiff further testified that she experienced pain in her hip and right leg, as well as fatigue, confusion, anxiety, and depression.  [T. 48-49].  Plaintiff testified that her current medications make her drowsy, as does pain.  [T. 44].  Plaintiff further testified that Dr. Bradley had told her not to lift over ten pounds or to sweep or mop.  [T. 45].

With regard to her activities of daily living, Plaintiff testified that she "piddle[s] with" household chores.  [T. 49].  She testified that she takes rest breaks as often as a dozen of more times a day.  [T. 50].  She further testified that she can stand for an hour and a half, and sit for an hour at a time.  [Id.].  Plaintiff testified that she stays tired all the time, but that she only lies down for a few minutes at a time during the day.  [T. 52].

In response to a series of questions from the ALJ, Plaintiff testified that she cooked, loaded the dishwasher, did laundry and folded clothes, cleaned the bathroom and other rooms, swept and mopped, and drove to the store two or three times per week.  [T. 53-54, 56]. She further testified that she had provided child care for her grandchildren until about one year before the hearing.  [T. 57].

Plaintiff testified that she had not done any yard work or gardening since her alleged onset date.  [T. 54-55].  When questioned by the ALJ regarding a notation in the medical record that indicated that she had been performing yard work, Plaintiff admitted that she had done yard work at her daughter's home in October 2007.  She denied, however, performing yard work on any other occasions.  [T. 55].

Plaintiff's daughter, Kelly Kashella, also testified.  Ms. Kashella reported that she visited Plaintiff daily to help her with household chores. [T. 62].  She stated that vomiting was a major problem for Plaintiff, and that she would vomit when she ate or got upset.  [T. 63-64].  Ms. Kashella further testified that Plaintiff had difficulty lifting the laundry, and that vacuuming would cause Plaintiff tremendous pain in her back and legs and make her hands numb.  [T. 64-65].  She reported that Plaintiff showed signs of fatigue every day and would be "truly bedridden for two to three

days" per month and "in the dark" because of headaches, despite taking Imitrex.[1]  [T. 66].  With respect to yard work, Ms. Kashella testified that Plaintiff could plant flowers while sitting but that she could not mow, weed or hang baskets.  [Id.].

A vocational expert was called to testify.  Given a hypothetical question assuming a reduced range of medium work, the vocational expert testified that Plaintiff could perform her past relevant work as a food prep person and cashier.  [T. 67-69].  Given the same physical limitations with the addition of missing work at various times, in one question, and with the addition of missing three days of work per month due to headaches, in another question, the vocational expert opined that competitive employment would be precluded.  [T. 69-70].

## V.    THE ALJ'S DECISION

On April 21, 2009, the ALJ issued a decision denying the Plaintiff's claim.  [T. 16-32].  Proceeding to the sequential evaluation, the ALJ found that the Plaintiff had not engaged in any substantial gainful activity since February 19, 2006.  [T. 18].  The ALJ then determined the following was a combination of severe impairments: migraine headaches, Barrett's

---

[1]The Court notes that the hearing transcript reveals no mention by the Plaintiff herself of any problems with migraines or headaches.

esophagus, COPD, GERD, and history of T10 and T11 fractures. [T. 18]. The ALJ concluded that her impairments did not meet or equal a listing. [T. 19]. He then determined that Plaintiff retained the residual functional capacity to perform the full range of medium work. [T. 25]. He found that Plaintiff could perform her past relevant work as cashier and food prep worker. [T. 31]. Accordingly, he concluded that the Plaintiff was not disabled. [T. 32].

## VI.   DISCUSSION

Plaintiff raises two principal assignments of error on appeal. First, she argues that the ALJ failed to follow the "special technique" enacted at 20 C.F.R. § 404.1520a in evaluating her mental impairments. Second, she argues that the ALJ's credibility determination is not supported by substantial evidence and was the result of a denial of due process.

## A.   The ALJ properly evaluated Plaintiff's mental impairments, and his findings were supported by substantial evidence.

Plaintiff asserts that the ALJ erred by failing to find her anxiety and depression severe at step two, and in failing to rate her limitations in the four mental functional areas at step four as required under 20 C.F.R. § 404.1520a. [Doc. 11 at 26-27].

The ALJ is required to follow a special technique required for sequentially evaluating mental impairments, as set out at 20 C.F.R. §

18

404.1520a.  "When a claimant alleges disability due to a mental condition, the Commissioner *must* follow a special technique set forth in 20 C.F.R. § 404.1520a and the Listing of Impairment[s]."  <u>Waters v. Astrue</u>, 495 F.Supp.2d 512, 515 (D.Md. 2007) (emphasis in original).  First, the ALJ is to evaluate the symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment.  20 C.F.R. § 404.1520a(b).  Second, the ALJ must rate the degree of functional limitation resulting from the mental impairment in four functional areas (activities of daily living; social functioning; concentration, persistence or pace; and episodes of decompensation) on a specific scale.  20 C.F.R. §404.1520a(c)(3) and (4).  The first three areas are to be rated according to a five-point scale (none, mild, moderate, marked, and extreme), and the last area is to be rated according to a four-point scale (none, one or two, three, or four or more).  20 C.F.R. § 416.920a(c)(4).  If a claimant's degree of limitation is rated as none or mild in the first three areas and none in the last area, the impairment will generally be found to be non-severe "unless the evidence otherwise indicates that there is more than a minimal limitation in [the claimant's] ability to do basic work activities . . . ." 20 C.F.R. § 416.920a(d)(1).  The ALJ is required to document the application of this special technique in his decision.  20 C.F.R. § 416.920a(e)(2).

In the present case, the ALJ properly followed this technique. Consistent with the requirements of 20 C.F.R. § 416.920a, the ALJ determined that there was no evidence of more than mild deficits in Plaintiff's daily activities, social functioning, and concentration, persistence or pace. [T. 19]. The ALJ further found no evidence of any extended episodes of decompensation. [Id.]. Both of these findings are amply supported by the record. Treatment records from both Dr. Teater and Dr. Balta reflect that Plaintiff's depression and anxiety responded well to medication. [T. 286, 290, 293, 297, 328]. Further, there is no indication in the record that these mental impairments caused Plaintiff any functional limitations. Importantly, neither Dr. Teater nor Dr. Balta noted any functional limitations due to Plaintiff's anxiety or depression. [T. 284-300; 307-15; 319-35].

Plaintiff cites to her brief treatment with Shellie E. Higgins, M.S., as evidence of a severe mental impairment. While Ms. Higgins found Plaintiff to have a flattened affect and depressed mood, she noted no deficits in Plaintiff's speech, thought content, attention, concentration, intellectual functioning, or judgment. [T. 257-58]. Further during her two subsequent sessions with Ms. Higgins, no medical evaluations were ordered nor were any functional limitations noted. [T. 247-59].

Ultimately, the Plaintiff bears the burden of establishing the existence of an impairment by objective medical evidence and to establish that any such medically determined impairment is severe.  20 C.F.R. §§ 416.908, 416.912.  The Plaintiff has failed to meet that burden here.  While recognizing that the severity determination involves a *de minimis* standard, see McCrea v. Comm'r of Soc. Sec., 370 F.3d 357, 360 (3d Cir. 2004), given the evidence of record, the Court concludes that there is substantial evidence to support the ALJ's conclusion that Plaintiff's mental impairment was not severe pursuant to 20 C.F.R. § 416.920a.[2]  Plaintiff's first assignment of error, therefore, is overruled.

**B.     The ALJ's assessment of Plaintiff's pain and symptoms followed applicable law and was supported by substantial evidence.**

Plaintiff argues that the ALJ improperly evaluated her complaints of pain, "ignoring most of the regulatory factors."  [Doc. 11 at 28].  She also argues that the ALJ improperly denied her due process at her hearing by failing to give her an opportunity to explain the specifics of her daily activities.

---

[2]The Plaintiff further argues that the ALJ erred by failing to rate her limitations in the four mental functional areas at step four as required under 20 C.F.R. § 404.1520a. Given the ALJ's conclusion at step two that Plaintiff's mental limitations did not even rise to the *de minimis* level, the ALJ was not required to perform a function-by-function analysis under step four.  This argument, therefore, is without merit.

The determination of whether a person is disabled by non-exertional pain or other symptoms is a two-step process, which subsumes the regulatory factors to which Plaintiff refers. "First, there must be objective medical evidence showing the existence of a medical impairment(s) ... which could reasonably be expected to produce the pain or other symptoms alleged." Craig v. Chater, 76 F.3d 585, 594 (4th Cir. 1996). If there is such evidence, then the ALJ must evaluate "the intensity and persistence of the claimant's pain, and the extent to which it affects his ability to work." Id. at 595. Specific factors evaluated include daily activities; the location, duration, frequency, and intensity of pain or other symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms; and other treatment and measures taken for relief of pain or other symptoms. 20 C.F.R. § 416.929(c)(3)(i-vi).

Having found that Plaintiff had severe conditions that reasonably could be expected to cause pain, the ALJ decision thoroughly recounted her evidence relating to symptoms, their duration, frequency and intensity, and the efficacy of treatment. [T. 19-32]. He noted that her reports of her daily activities did not describe a level of pain inconsistent with the RFC for medium work that he had determined. [T. 26]. He further noted that pain

medications were at least somewhat effective on her pain. [T. 26]. He pointed out numerous inconsistences between her hearing testimony and her reports to doctors about the severity of her back pain, headaches, and mental symptoms. [T. 27-30]. The ALJ observed that no treating physician opined on limitations consistent with those Plaintiff claimed. [T. 31]. He further noted Plaintiff's non-compliance with recommended treatment. [T. 28-9]. "In considering the credibility of the claimant's subjective allegations of pain, the ALJ must consider (factors which include) the extensiveness of the attempts (medical or nonmedical) to obtain relief...." McKenney v. Apfel, 38 F.Supp.2d 1249, 1259 (D. Kan. 1999) (citing Hargis v. Sullivan, 945 F.2d 1482, 1490 (10th Cir. 1991)). The ALJ properly evaluated each of the factors required under 20 C.F.R. § 416.919, and there is substantial evidence in the record to support his ultimate determination regarding Plaintiff's pain and her credibility.

Plaintiff further argues that the ALJ erred in his consideration of her daily activities and that he violated her due process rights by not giving her the opportunity to explain the specifics of her activities. [Doc. 11 at 26-28]. Both of these arguments are without merit. First, the ALJ properly considered Plaintiff's daily activities in assessing her complaints of pain.

[T. 26].  While Plaintiff argues that the ALJ improperly considered evidence that she was capable of gardening, there is a notation in the medical evidence indicating that Plaintiff reported performing this type of work.  [see T. 340].  Based upon this evidence, the ALJ properly concluded that Plaintiff's activities undercut her claim that she was completely disabled from working.  Second, while Plaintiff complains that she was denied the opportunity to further explain her answers during the ALJ's questioning, the Court notes that the ALJ did not close the hearing once his examination was completed, but rather invited her counsel to resume questioning, thus creating a reasonable opportunity for Plaintiff to explain her testimony.  [T. 59].  Plaintiff has demonstrated no error in the manner in which the ALJ conducted the hearing and has shown no deprivation of due process.

In the end, Plaintiff presented medical evidence and testimony that she had impairments which produced some degree of limitation, but the record as a whole fails to support her allegation that her pain was so severe as to render her disabled.  "Because he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight."  Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984).  For the

reasons stated herein, the Court finds that the ALJ's analysis of Plaintiff's allegations of pain and her overall credibility followed applicable law and was supported by substantial evidence.

## VII.  CONCLUSION

For the foregoing reasons, the Court concludes that the ALJ applied the correct legal standards, and that there is substantial evidence to support the ALJ's finding of no disability through the date of his decision.

## O R D E R

Accordingly, **IT IS, THEREFORE, ORDERED** that the Defendant's Motion for Summary Judgment [Doc. 14] is **GRANTED**.

**IT IS FURTHER ORDERED** that the Plaintiff's Motion for Judgment on the Pleadings [Doc. 10] is **DENIED**.

A judgment shall be entered simultaneously herewith.

**IT IS SO ORDERED.**

Signed: August 11, 2011

Martin Reidinger
United States District Judge